UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                     Case No. 21-CR-028

ASHTON HOWARD,

        Defendant.

## UNITED STATES' RESPONSE TO DEFENDANT'S
## MOTION TO DISMISS INDICTMENT

The United States of America, by and through its attorneys, Richard G. Frohling, Acting United States Attorney, and John P. Scully and Benjamin Proctor, Assistant United States Attorneys, hereby submits the following response to the defendant's Motion to Dismiss Indictment. (Doc. #27).[1] For the reasons stated below, the defendant's motion should be denied.

## I.    INTRODUCTION

The United States charged Ashton Howard with violating 18 U.S.C. § 231(a)(3) after an investigation linked him to a violent attack on a Kenosha Police Department (KPD) officer. That officer was attempting to secure and move a police squad car that had been badly damaged during the civil unrest that spread through Kenosha, Wisconsin, on August 23, 2020, following the shooting of Jacob Blake. Video of the attack shows the officer collapse to the ground after being hit in the head by a heavy object that was thrown at him from several feet away. The

---

[1] Motions making nearly identical arguments to those presented in Howard's motion have been filed in other districts. *See United States. v. Phomma,* Doc. #18, Case No. 20-CR-00465 (D. Or.); *United States v. Pugh*, Doc. #52, Case No. 20-CR-00073 (S.D. Ala.).

1

government will prove at trial that Howard intentionally threw that heavy object—a brick—at the officer and knocked him unconscious.

Contrary to the suggestion in Howard's motion, Howard was not charged with violating § 231(a)(3) based on participation in protests or support for racial justice. His assertion that this prosecution arose "from demonstrations in support of racial justice" is highly misleading. (Doc. #27, at 11). Indeed, Howard rightly acknowledges that the indictment against him stemmed from the investigation into the officer's injury. *See id.*

In his motion to dismiss the indictment, Howard contends that § 231(a)(3) is unconstitutional on several fronts. Alternatively, Howard argues that Count One of the indictment is insufficient and, thus, dismissal is warranted.

Howard's motion should be denied. He has failed to carry his burden to demonstrate that § 231(a)(3) is unconstitutional, and he has failed to show that the indictment is so deficient as to warrant dismissal. Accordingly, for the reasons discussed herein, the Court should reject Howard's arguments.

## II.       BACKGROUND[2]

On Sunday, August 23, 2020, Jacob Blake was shot multiple times by a KPD officer. That incident triggered both non-violent protests and violent rioting during the evening of August 23, 2020, and the ensuing days, including numerous arsons throughout the City of Kenosha. The unrest and violence grew so dangerous that Kenosha County declared a state of Emergency Curfew and the Wisconsin National Guard eventually deployed over 1,000

---

[2] While Howard's challenge focuses on the constitutionality of 18 U.S.C. § 231(a)(3), his brief includes numerous references to the facts and circumstances of this case. The government includes a brief summary of facts to provide context to the issues before the Court. Many of these facts were referenced in affidavits in support of search warrants in the investigation, including Case No. 20-MJ-508.

2

individuals to keep the peace.[3] On the evening of August 25, 2020, three individuals were shot in Kenosha, two of them fatally.[4]

A video of the Jacob Blake shooting quickly became national news, and a crowd gathered near the location of the shooting. Throughout the course of the evening on August 23, certain people in the crowd grew increasingly agitated and began damaging police vehicles. Members in the crowd also began to throw various objects at the law enforcement officers on scene. Around 9:10 p.m., a KPD captain, T.H., was assisting other KPD officers with moving an unsecured, badly damaged, running squad car that still contained a loaded shotgun.

While T.H. and other officers were near the vehicle, members of the crowd encroached upon the officers, preventing them from moving forward. A Molotov cocktail was thrown in the direction of the officers and the squad car, which burst into flames near the rear of the vehicle. Shortly thereafter, an object thrown from the crowd hit T.H. in the head and knocked him unconscious.[5]

---

[3] The civil disorder in Kenosha on August 23, 2020, obstructed, delayed, or adversely affected interstate commerce in several ways. For instance, due to the unrest that day, two Gulf gas stations in Kenosha closed around 8:00 p.m., several hours earlier than usual. Rioters broke into both stations later that evening. Additionally, due to the unrest that day, Amazon ended package delivery service to that region before 9:00 p.m., which was earlier than usual.

[4] *See* Sophie Carson and Meg Jones, *Kenosha Businesses Damaged and Vehicles Burned after Police Officer Shoots Jacob Blake in the Back,* Milwaukee J. Sentinel, Aug. 24, 2020, available at https://www.jsonline.com/story/news/2020/08/24/kenosha-protests-escalate-after-police-shoot-black-man-jacob-blake/3427941001/ (last visited Apr. 30, 2021); Janet Loehrke, et al., *A Visual Timeline of Violence in Kenosha after Police Shooting of Jacob Blake,* USA Today, August 27, 2020, available at https://www.usatoday.com/in-depth/graphics/2020/08/27/jacob-blake-kenosha-police-shooting-two-killed/3442878001/ (last visited Apr. 30, 2021).

[5] Video of the incident can be found embedded in the following online article: Lee Brown, *Wisconsin Officer Knocked Out by Brick Thrown During Riots in Kenosha,* August 24, 2020, https://nypost.com/2020/08/24/officer-knocked-out-by-brick-thrown-in-kenosha-as-protesters-shout-f-k-the-police/ (last visited Apr. 30, 2021).

3

On January 4, 2021, Howard was charged by criminal complaint with being a felon in possession of ammunition. (Doc. #1). On January 26, 2021, a federal grand jury in the Eastern District of Wisconsin returned a two-count indictment charging Howard with (1) obstructing, impeding, and interfering with a law enforcement officer engaged in official duties incident to and during the commission of a civil disorder, in violation of 18 U.S.C. § 231(a)(3); and (2) being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. #12). On April 9, 2021, Howard filed the instant motion to dismiss the indictment. (Doc. #27).

### III.    DISCUSSION

As part of the Civil Rights Act of 1968,[6] Congress criminalized interference with a police officer or firefighter "lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce . . . ." 18 U.S.C. § 231(a)(3). The statute defines "civil disorder" as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1). And criminal liability extends to actions directed against any federal, state, or local law enforcement officers. 18 U.S.C. § 232(7).

Howard challenges the constitutionality of 18 U.S.C. § 231(a)(3) in several ways. First, Howard contends that Congress exceeded its authority under the Commerce Clause in enacting § 231(a)(3). Second, he asserts that § 231(a)(3) is unconstitutionally overbroad, in violation of the First Amendment. And third, Howard argues that § 231(a)(3) is unconstitutionally vague, in

---

[6] Title X of the Civil Rights Act of 1968 was also referred to as the Civil Obedience Act.

4

violation of the Fifth Amendment. (Doc. #27). As an alternative, Howard asserts that Count One of the indictment in this case, which charges a violation of § 231(a)(3), is insufficient and must be dismissed. These arguments are addressed in turn.

### A. Howard's Reliance on Legislative History is Misplaced.

At the outset of his motion, Howard spends considerable time discussing the legislative history of 18 U.S.C. § 231. Among other things, he contends § 231(a)(3) was enacted "to counter the protections of the Civil Rights Act and to silence civil rights leaders in 1968." (Doc. #27, at 1). This claim is wrong.

It is well-established that courts start with the text of a statute to ascertain its plain meaning, and if the statutory language's plain meaning is unambiguous, the court's "inquiry ends there." *United States v. Melvin*, 948 F.3d 848, 851–52 (7th Cir. 2020) (citing cases). When a statute is clear, "any consideration of legislative history is improper." *United States v. Rand*, 482 F.3d 943, 947 (7th Cir. 2007). Indeed, the Supreme Court has "explained many times" that "when the meaning of the statute's terms is plain, our job is at an end." *Bostick v. Clayton County*, 140 S. Ct. 1731, 1749 (2020). Here, Howard has not shown that the statute is ambiguous, and § 231(a)(3)'s legislative history is simply irrelevant.

Even so, the government is compelled to point out that Howard's claims about legislative history are cherry-picked misrepresentations. His exclusive focus is on Senator Russell Long (D–Louisiana), who made highly offensive remarks. However, most of the statements highlighted by Howard relate not to § 231(a)(3), but rather to earlier proposed legislation. (*See* Doc. #27, at 4). Furthermore, Howard fails to mention the fact that Senator Long ultimately voted *against* H.R. 2516, which contained § 231. *See* 114 CONG. REC. 5992 (1968). The Senate passed this

legislation, in bipartisan fashion, with votes from high-profile civil rights supporters, including Senators Robert Kennedy (D–N.Y.) and Everett Dirksen (R–Ill.).

Howard's reliance on legislative history is entirely misplaced because he has not demonstrated that the language in § 231(a)(3) is ambiguous, as the Seventh Circuit requires. Even if he had made the requisite showing, his focus on just the statements of Senator Long— and silence on the rest of the statute's legislative history—is not the proper method of analysis. For these reasons, the one-sided version of legislative history put forth by Howard should not be used as part of this Court's constitutional analysis of § 231(a)(3).

## B. To the Extent Howard Is Making a Selective Prosecution Argument, His Claim Should be Rejected.

Howard alleges that § 231(a)(3) is "seldom-invoked." (Doc. #27, at 1, 10–11). Currently, § 231(a)(3) is being used to prosecute many of the individuals who attacked the U.S. Capitol on January 6, 2021, as well as those who participated in the civil unrest that occurred during the summer of 2020. To date, the United States has charged over 80 people with violating § 231(a)(3) in connection with these events. Thus, while this statute may not have been used as frequently as others in the past, it is currently being applied to prosecute the criminal conduct engaged in by Howard and many others.

To the extent Howard is asserting he is the subject of selective prosecution, his claim should be rejected. To succeed on a selective prosecution claim, a defendant must show that "'the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *United States v. Alanis*, 265 F.3d 576, 585 (7th Cir. 2001) (quoting *United States v. Hayes*, 236 F.3d 891, 895 (7th Cir. 2001)). Specifically, Howard would need to demonstrate that "similarly situated individuals of a different race were not prosecuted." *Id.*; s*ee also United States v. Habib*, No. 18-CR-16, 2020WL3097819, at *3 (E.D. Wis. June 11, 2020)

6

("to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary") (quoting *United States v. Armstrong*, 517 U.S. 456 (1996)). Howard has not attempted to make such a showing. Accordingly, to the degree that Howard is alleging selective prosecution, his claim should be rejected.

**C. Howard's Constitutional Challenges Should be Rejected.**

    1. <u>§ 231(a)(3) Is a Proper Exercise of Congress' Commerce Clause Authority.</u>

Howard challenges the constitutionality of § 231(a)(3) by arguing that the statute "exceeds Congress' Commerce Clause Power because it criminalizes intrastate activity that lacks a substantial nexus to interstate commerce." (Doc. #27, at 11). However, Howard's interpretation of § 231(a)(3) is flawed and should be rejected.

The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, Cl. 3. "[I]t is now well established that Congress has broad authority under th[at] Clause." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.). Congressional power under the Commerce Clause "'is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution.'" *United States v. Vasquez,* 611 F.3d 325, 329 (7th Cir. 2010) (quoting *United States v. Schaffner*, 258 F.3d 675, 678 (7th Cir. 2001)). Federal legislation enjoys a presumption of constitutionality that may only be overturned "upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000).

Among other things, "the Commerce Clause has . . . long been interpreted" to grant Congress authority "extend[ing] beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate

7

commerce." *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 241 (1980). The Supreme Court's jurisprudence accordingly establishes that, "under its commerce power," Congress may regulate the "channels of interstate commerce," "instrumentalities of interstate commerce" and "persons or things in interstate commerce," and "those activities that substantially affect interstate commerce." *Taylor v. United States*, 136 S. Ct. 2074, 2079 (2016) (quoting *Lopez*, 514 U.S. at 558–59); *accord Morrison*, 529 U.S. at 608–09; *see also, e.g., Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005); *Perez v. United States*, 402 U.S. 146, 150 (1971). As the Seventh Circuit has stated, though, these three categories "ought not to be considered hermetically sealed constructs designed solely for rigid application," as "many congressional exercises of authority are justifiable under more than one of the *Lopez* categories." *United States v. Schaffner*, 259 F.3d 675, 679 (7th Cir. 2001) (citing *United States v. Lopez*, 514 U.S. 549 (1995)).

§ 231(a)(3) is one of many statutory provisions enacted by Congress to protect the flow of interstate commerce from unwarranted interference. Where a civil disorder is "obstruct[ing], delay[ing], or adversely affect[ing]" interstate commerce or the movement of an item in interstate commerce,[7] Congress sought to provide law enforcement and firefighters with the ability to contain and ultimately end the crisis without obstruction from persons, like Howard, who would impede them. In doing so, Congress was acting to protect the channels of interstate commerce, including roads and highways, to protect the flow of things in interstate commerce, and to regulate activity that substantially affects interstate commerce. § 231(a)(3) thus fits

---

[7] The term "commerce" in § 231(a)(3) is defined to mean "commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia." 18 U.S.C. § 232(2). The first two prongs define commerce as interstate commerce and implement Congress' Commerce Clause power; the third prong is not at issue in this case.

8

comfortably within all three of the areas of Congressional power identified by the Supreme Court in *Lopez*, *Morrison*, and *Taylor*.

> a. § 231(a)(3) Contains a Jurisdictional Element, Which Materially Distinguishes it from the Statutes Struck Down in *Lopez* and *Morrison*.

Howard's reliance on *Lopez* and *Morrison* is misplaced. Those decisions struck down statutory provisions that regulated non-economic activity unconnected to interstate commerce and which, crucially, did not contain a jurisdictional element related to interstate commerce. It has long been understood that Congress may regulate even non-economic intrastate activity so long as there is a jurisdictional provision that ensures the statute applies only where the regulated activity affects (or would affect) interstate commerce. *Compare United States v. Bass*, 404 U.S. 336 (1971) (upholding statute that regulated "receiv[ing], possess[ing], or transport[ing] in commerce or affecting commerce . . . any firearm" by a felon), *with Lopez*, 514 U.S. at 562 (striking down statute where, "[u]nlike the statute in *Bass*, [the Gun-Free School Zones Act had] no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce"), *and Morrison*, 529 U.S. at 613 (holding that the civil remedies in 42 U.S.C. § 13981 were beyond Congress' power under the Commerce Clause where, "[l]ike the Gun–Free School Zones Act at issue in *Lopez*, § 13981 contain[ed] no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce.").

Indeed, as multiple circuits have recognized, the very constitutional defect identified in *Lopez* was cured by the addition of a jurisdictional element. *See, e.g., United States v. Thomas*, 810 Fed. App'x 789, 796 (11th Cir. 2020) (noting that "Congress amended § 922(q) to include an explicit 'affecting interstate commerce' element to cure the deficiencies identified in

9

*Lopez*"); *United States v. Dorsey*, 418 F.3d 1038, 1046 (9th Cir. 2005) ("This jurisdictional element saves § 922(q) from the infirmity that defeated it in *Lopez*"), *abrogated on other grounds*, *Arizona v. Gant* 556 U.S. 332 (2009); *United States v. Danks*, 221 F.3d 1037, 1038–39 (8th Cir. 1999). The Seventh Circuit has regularly upheld as constitutional Congress' use of a jurisdictional hook to ensure that a statute regulating intrastate activity affects interstate commerce. *See United States v. Taylor*, 226 F.3d 593, 600 (7th Cir. 2000) (quoting *Lopez*, 514 U.S. at 561) (carjacking statute's "inclusion of just such a jurisdictional element (absent in *Lopez* itself) 'would ensure, through case-by-case inquiry, that the [regulated conduct] in question affects interstate commerce'"); *United States v. Bell*, 70 F.3d 495, 498 (7th Cir. 1995) (noting that § 922(g) "does not suffer from the same infirmities" as § 922(q) did in *Lopez* because it "contains an explicit requirement that a nexus to interstate commerce be established").

To be sure, a constitutionally adequate jurisdictional element must be "meaningful" and not merely a "talisman that wards off constitutional challenges." *United States v. Patton*, 451 F.3d 615, 632–33 (10th Cir. 2006) (noting that § 844(i)'s jurisdictional hook as interpreted in *Jones* "served the purpose of limiting the statute to arson cases where there really was a substantial and non-attenuated effect on interstate commerce"). § 231(a)(3)'s jurisdictional hook easily meets this test. There are innumerable disturbances of the peace, but § 231(a)(3) applies only to the subset of civil disorders that affect interstate commerce, such as those that cut off access to thoroughfares, prevent use of significant commercial or government buildings, or prevent the movement of goods and articles in commerce. And an individual can be charged under § 231(a)(3) only if he or she impedes or attempts to impede police or firefighters—the very public safety professionals charged with containing, mitigating, and ultimately ending the

10

public disturbance, and thereby restoring the channels and instrumentalities of interstate commerce. The statute thus applies only in relation to civil disorders that adversely affect interstate commerce and only with regard to a specific class of activities that will tend to prolong the obstruction of interstate commerce.

The jurisdictional element in *Bell* that the Seventh Circuit found sufficient to render 18 U.S.C. § 922(g)(1) constitutional required that the firearm at issue "had traveled in interstate commerce." 70 F.3d at 498; *see also* 18 U.S.C. § 922(g)(1) (firearm "which has been shipped or transported in interstate or foreign commerce"); *Vasquez*, 611 F.3d at 330–31 (noting that § 2250(a)'s "failure to require a connection between the jurisdictional element of travel and the criminal act of failing to register [as a sex offender] is not fatal"). § 231(a)(3)'s jurisdictional element has a much tighter temporal limitation. While, under § 231(a), a defendant's conduct must take place contemporaneously with the civil disorder that disrupted commerce, under § 922(g) the gun may have moved in interstate commerce at some point in the distant past. § 231(a) also has a more proximate relationship to Congress' goal of protecting interstate commerce—aiming directly to end an impediment to interstate commerce—while the gun statute regulates commerce indirectly by prohibiting the intrastate use of an item that previously moved in interstate commerce. Thus, *Bell*'s holding requires a similar holding here.[8]

> b. There Is No Requirement that the Jurisdictional Element in § 231(a)(3) Must Have a Substantial Effect on Commerce.

Additionally, Howard's argument that the jurisdictional element is required to involve a *substantial* effect on commerce is wrong. Jurisdictional elements generally condition the

---

[8] Moreover, even if there were some hypothetical application of § 231(a)(3) that reached beyond Congress' constitutional power, that would not facially invalidate the statute. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 733 (2000).

application of a statute on an effect on interstate commerce in the particular case. For example, similar to the 922(g) element discussed above, the Hobbs Act applies to one who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce" by robbery or extortion. 18 U.S.C. § 1951. § 231(a)(3)'s jurisdictional element is no broader than this. *See Taylor*, 136 S. Ct. at 2079 (discussing the breadth of the Hobbs Act jurisdictional element); *see also United States v. Stillo*, 57 F.3d 553, 558 (7th Cir. 1995).

Moreover, Supreme Court precedent holds that "Congress may regulate violent conduct interfering with interstate commerce even when the conduct itself has a 'minimal' effect on such commerce." *United States v. Hill*, 927 F.3d 188, 199 (4th Cir. 2019) (quoting *Taylor*, 136 S. Ct. at 2079). As the Fourth Circuit recognized, the Supreme Court's decisions in *Taylor* and *Jones* "establish that when Congress may regulate an economic or commercial activity, it also may regulate violent conduct that interferes with or affects that activity." *Id.* at 201.

The "substantially affects" test that Howard advocates applies where Congress seeks to regulate an entire class of activities based on the aggregate effect of that entire class rather than the specific effect of the activity of a particular defendant. Thus, in *Raich*, the Supreme Court found the Controlled Substances Act's categorical ban on intrastate manufacture and possession of marijuana was constitutional because Congress had a rational basis for concluding that the "class of activities" *in the aggregate* substantially affected commerce, and the Act could be applied constitutionally to Raich's intrastate growing of marijuana for personal medicinal purposes even though her activity did not substantially affect interstate commerce. 545 U.S. at 15–22. Howard is thus mistaken in arguing that the United States must show that *his* activity *substantially* affected commerce or that a jurisdictional element must include a "substantially affects" requirement.

c. There Is No Requirement that Howard's Personal Conduct Must Affect Interstate Commerce.

Howard's personal conduct need not affect commerce as long as the underlying civil disorder affected commerce. Other statutes likewise do not require proof that the defendant personally affected commerce, where the defendant's conduct relates to an underlying activity that had the required effect. *See, e.g.*, *United States v. Juvenile Male*, 118 F.3d 1344, 1347–49 (9th Cir. 1997) (upholding RICO's jurisdictional nexus requirement where it is the racketeering enterprise, not the defendant himself, that must affect commerce); *United States v. Ramos*, No. 1:02-CR-730-14, 2016 WL 8222072, at *5 (N.D. Ga. Dec. 19, 2016) (same).

Howard's attempt to distinguish the Hobbs Act on the ground that the Act is "directly aimed at economic activities" likewise fails. (Doc. #27, at 17 n.9). Both the Hobbs Act and § 231(a)(3) aim to protect interstate commerce from illegal acts that impede commerce. In a similar way, courts have upheld the jurisdictional requirement of RICO, which applies to non-economic enterprises. *See Nat'l. Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256–58 (1994) (holding that RICO does not require that the enterprise or predicate acts be accompanied by an economic motive). Like a RICO enterprise, a civil disorder "surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives." *Id.* at 258.

Since § 231(a)(3) applies only where a defendant seeks to impede the work of police or firefighters incident to a civil disorder that affects interstate commerce, it is within Congress' Commerce Clause authority to regulate such conduct. This statute easily passes constitutional muster under the most recent Court precedent. *See Taylor,* 136 S.Ct. at 2079–81; *see also United States v. Featherston,* 461 F.2d 1119, 1123 (5th Cir. 1972) (rejecting challenge to the same jurisdictional element in § 231(a)(1) as failing "to rise to the level of a substantial

13

constitutional question"); *United States v. Hoffman*, 334 F. Supp. 504, 509 (D.D.C. 1971) (holding that § 231(a)(3) was not an "unconstitutional exercise[] of the commerce power"). Moreover, even under the most restrictive theory of Congress' Commerce Clause power advanced by Justice Clarence Thomas, a law protecting interstate commerce from interference, as § 231(a)(3) does, is a permissible use of Congressional power. Such a law "bears an obvious, simple, and direct relation to regulating interstate commerce: it allows commerce to flow between States unobstructed." *Taylor*, 136 S. Ct. at 2085 (Thomas, J., dissenting) (quotation marks omitted).

The jurisdictional element in § 231(a)(3) ensures that the statute applies only where the civil disorder that the defendant sought to prolong—by obstructing the public safety personnel whose duty is to mitigate, contain, and end the disturbance—is one that adversely affected interstate commerce. Such a jurisdictional provision renders the statute constitutional. Moreover, under any understanding of the Commerce Clause, a statute that protects the flow of commerce between the states from obstructions, as § 231(a)(3) does, is a permissible use of Congress' powers. For all these reasons, this Court should reject Howard's claim that § 231(a)(3) is an unconstitutional stretch of Congress' authority under the Commerce Clause.

    2.  <u>§ 231(a)(3) Is Not an Overbroad Content-Based Restriction on Expression in Violation of the First Amendment.</u>

Howard next challenges § 231(a)(3) as facially overbroad in violation of the First Amendment. (Doc. #27, at 21–33). Specifically, he claims that the statute (1) "is a substantially overbroad regulation of protected expression," and (2) "was enacted for the express legislative purpose of suppressing the content of messages favoring civil rights advocacy . . . ." *Id.* at 21. His arguments are without merit and should be rejected.

Howard is charged with obstructing or interfering with police officers or firefighters in the context of civil disorders. § 231(a)(3) primarily prohibits a narrow type of conduct, not speech. And to the extent it reaches speech, it does so incidentally and only with respect to the type of illegal, obstructive, or threatening communications that have long been recognized as unprotected. It does not criminalize verbally criticizing police or other protected speech, and it is therefore not an overbroad restriction of speech.

An overbreadth claim is a facial challenge to the constitutionality of a statute. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985). As the Supreme Court has explained, the overbreadth doctrine "prohibits the Government from banning protected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002). Accordingly, a statute that "prohibits a substantial amount of protected speech" is "facially invalid," and therefore, unconstitutional. *United States v. Williams*, 553 U.S. 285, 293 (2008); *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).

Facial overbreadth challenges can also be raised when the statute primarily targets conduct as opposed to speech. However, defendants who raise such challenges face a steep uphill climb. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social cost created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct").

Without question, Howard's conduct—violently assaulting a police officer by throwing a brick—is neither protected speech nor protected conduct. Despite the nature of Howard's conduct, however, he can still raise a facial challenge to the constitutionality of the statute. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (a defendant whose conduct is not

15

constitutionally protected can raise an overbreadth challenge on the grounds "that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or protection"); *United States v. Bonin*, 932 F.3d 523, 536 (7th Cir. 2019) (quoting *New York v. Ferber*, 458 U.S. 747, 769 (1982)) (a defendant may "attack overly broad statutes even though the conduct of the person making the attack is clearly unprotected . . . .").

It is well-established that the challenging party bears the burden to prove a statute is unconstitutional due to overbreadth. *See Hicks*, 539 U.S. at 122; *Bonin*, 932 F.3d at 537. Thus, to prevail, Howard must demonstrate that § 231(a)(3) "potentially reaches a 'substantial' amount of protected speech." *See Bonin*, 932 F.3d at 537 (quoting *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012)). Both the Supreme Court and the Seventh Circuit recognize this as a high barrier to overcome:

> The overbreadth doctrine is "strong medicine" that should be "employed . . . with hesitation, and then only as a last resort." [] Accordingly, courts "vigorously enforce[ ] the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."

*Ctr. for Individual Freedom*, 697 F.3d at 476 (quoting *Ferber*, 458 U.S. at 769; *Broadrick*, 413 U.S. 613; *Williams*, 553 U.S. at 292); *City of Houston v. Hill*, 482 U.S. 451, 458 (1987) (facial invalidity is limited to those cases involving "substantial overbreadth").

Moreover, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Williams*, 553 U.S. at 303 (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)). Rather, to satisfy his burden, Howard must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Bonin*, 932 F.3d at 537 (quoting *Taxpayers for Vincent*, 466 U.S. at 801); *see*

16

*also Hicks*, 539 U.S. at 124 (observing that an "overbreadth challenge" to such a law will "[r]arely, if ever, . . . succeed").

  a. § 231(a)(3) Targets Unprotected Conduct, Not Protected Speech.

  The first step in evaluating Howard's claim is to determine what § 231(a)(3) criminalizes. *Williams*, 553 U.S. at 293 (noting that "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers"). Howard claims that the "broad language of the statute and its purpose to target certain speech and political movements for civils rights invalidates the statute under the First Amendment." (Doc. #27, at 26). He is wrong. § 231(a)(3) does not target protected speech or expression, but rather criminalizes intentional, unprotected conduct.

  § 231(a)(3) does not prohibit a person's presence at or general participation in a civil disorder.[9] *See United States v. Mechanic*, 454 F.2d 849, 853 (8th Cir. 1971). Rather, as several courts have held, it prohibits intentionally obstructive acts committed during the course of a civil disorder. *See id.* (noting that because the statute "reaches only acts to impede, obstruct, or interfere with police officers and firemen," it "does not purport to reach speech of any kind"); *United States v. Rupert*, No. 20-CR-104, 2021 WL 942101, at *9 (D. Minn. Mar. 12, 2021) (citing *Mechanic*, 454 F.2d at 853) (finding that § 231(a)(3) covers acts and does "not expressly regulate First Amendment expression"); *United States v. Banks*, 368 F. Supp 1245, 1247 (D.S.D. 1973) (noting the "difference between prohibiting free *expression*" and "prohibiting certain *acts* to impede, obstruct or interfere. . .") (emphasis in original), *abrogated on other grounds*, *United*

---

[9] Dozens of individuals were present at or participated in the civil disorder in Kenosha on August 23, 2020, and thereafter. To date, however, only Howard has been charged with violating § 231(a)(3).

17

*States v. Auginash*, 266 F.3d 781 (8th Cir. 2001).[10] As such, § 231(a)(3) is not unique; many state and federal statutes likewise criminalize obstructing the government's efforts to enforce the law and maintain public order. *See, e.g., United States v. Jeter,* 775 F.2d 670, 679 (6th Cir. 1985) (holding that federal obstruction of justice statute, 18 U.S.C. § 1503, is neither overbroad nor vague); 26 U.S.C. § 7212(a) (prohibiting obstructing or impeding the administration of the tax laws); 18 U.S.C. § 2237 (making it unlawful to "oppose, prevent, impede, intimidate or interfere with" a maritime investigation); *United States v. Brice,* 926 F.2d 925, 930–31 (9th Cir. 1991) (rejecting overbreadth and vagueness challenges to federal regulation prohibiting impeding or disrupting government duties).[11]

The cases cited by Howard do not support his position. He incorrectly claims that the court in *McCoy v. City of Columbia*, 929 F. Supp. 2d 541 (D.S.C. 2013), invalidated an ordinance as overbroad. (*See* Doc. #27, at 23, 28). The court in *McCoy* specifically stated that, although "whether the Ordinance is unconstitutional as substantially overbroad is a close question," it was "not necessary for the court to decide the overbreadth issue." *Id.* at 552. The same is true of *Roy v. City of Monroe*, in which the court upheld a statute against a vagueness

---

[10] Though Howard states that prior decisions interpreting § 231(a)(3) predate some of the recent jurisprudence, (Doc. #27, at 26 n.10), those courts squarely rejected these very same defense arguments.

[11] As the statute by its terms, "has no application to speech, but applies only to violent physical acts," *Mechanic*, 454 F.2d at 852, this Court's inquiry should be at an end. If the Court were to review the legislative history, however, § 231(a)(3)'s context and purpose confirm the statute's focus on conduct, not protected speech. Congress designed the civil disorder statute to provide federal support when people "agitate and incite such violence by the use of facilities in interstate commerce." 90th Congress, 1st Session, House Report No. 472, at 2–3. Recognizing the need to support local law enforcement, Congress believed the federal government should lend a hand, Senate Congressional Record, March 6, 1968, at 5537, by not only sending federal law enforcement to assist, but also criminalizing violent acts directed at local partners. Construing the statute to cover only intentional conduct, rather than as a sweeping prohibition on protected speech, is consistent with Congress' basic objective in passing it. *See United States v. Rundo,* 990 F.3d 709, 718 (9th Cir. 2021) (anti-riot statute); *United States v. Miselis,* 972 F.3d 518, 543 (4th Cir. 2020) (same).

18

challenge and noted that the plaintiff "failed to preserve the issue of overbreadth" on appeal. 950 F.3d 245, 253 (5th Cir. 2020). These cases thus do not support a finding of overbreadth.

Further, § 231(a)(3) is not akin to the municipal ordinance found overbroad in *City of Houston*, which made it "unlawful" to "in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty." 482 U.S. at 455. On its face, the municipal ordinance covered both speech and action, but the parties agreed the assault portions of the ordinance were preempted by the state penal code, rendering the ordinance enforceable only as to verbal opposition. *Id.* at 460. The ordinance also swept broadly, covering "any manner" of such verbal opposition, molestation, abuse, or interruption. *Id.* at 462–64. The Texas courts had never limited the ordinance's broad sweep and it had, in fact, been applied to simple verbal confrontations. *Id.* at 469–70. The civil disorder statute, by contrast, is much narrower and lacks the core offending language—"in any manner oppose"—found in the municipal ordinance. And, instead of reading it as having a broad sweep, the courts that have considered the civil disorder statute have narrowed it to cover only unprotected conduct. *See, e.g.*, *Mechanic*, 454 F.2d at 849.

        b. § 231(a)(3)'s Scienter Requirement Limits the Statute's Scope to Intentional Conduct.

The *mens rea* element in § 231(a)(3) fatally undercuts Howard's arguments. The Seventh Circuit and other courts have properly interpreted the statute as containing a *mens rea* requirement. Contrary to Howard's suggestion that individuals could be charged under this statute for merely engaging in protected speech or expression, the statute criminalizes only those acts that are done with the intent to obstruct, interfere, or impede. The Seventh Circuit has noted:

19

> It is true that Section 231(a)(3) does not specifically refer to intent, but it only applies to a person who "commits or attempts to commit any act to obstruct, impede, or interfere" with firemen or law enforcement officers. Under such phraseology, it will not be presumed that Congress intended strict liability for inadvertent or accidental occurrences where, as here, the crime is grounded on the common law.

*Nat. Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969);[12] *see also Mechanic*, 454 F.2d at 854 (agreeing that "§ 231(a)(3) must be construed to require intent."). The Seventh Circuit's reasoning in *Foran* is grounded in the plain language of the statute, which requires proof that the "act" was done "to obstruct, impede, or interfere with a firefighter or police officer." The natural reading of this language is that the government must prove the defendant's purpose or intent in carrying out the "act" was "to obstruct, impede, or interfere with."

This textual reading of § 231(a)(3) is consistent with the principle that courts will "generally interpret [] criminal statutes to include broadly applicable scienter requirements, even when the statute by its terms does not contain them." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citation omitted); *see also Virginia v. Am. Booksellers Ass'n.*, 484 U.S. 383, 397 (1988) (if statute is "readily susceptible to a narrowing construction that would make it constitutional, it will be upheld"); *Featherston,* 461 F.2d at 1121 (rejecting First Amendment challenge and construing § 231(a)(1) to "require a showing of knowledge or intent").

The importance of the scienter requirement to the First Amendment analysis is evident in *Williams*, in which the Supreme Court rejected an overbreadth challenge to a statute prohibiting, among other things, presenting and promoting child pornography. 553 U.S. at 294–97. The Court acknowledged that the words "present" and "promote" in the statute could,

---

[12] In *Foran*, the plaintiffs sought a declaratory judgment that the civil disorder and riot statutes were unconstitutional, but then "appear[ed] to have conceded the constitutionality of § 231(a)(3)." 411 F.2d at 937. The Seventh Circuit proceed to address the issue and stated that § 231(a)(3) did not present "any substantial constitutional question." *Id.* at 938.

20

"in isolation," be viewed as targeting mere advocacy. *Id.* However, the Court rejected that construction based on other textual indicators, including the statute's scienter requirement and the "common sense canon" by which "a word is given more precise content by the neighboring words with which it is associated." *Id.*; *see also id.* at 307 (Stevens, J., concurring) (observing that the Court's construction would be "compelled by the principle that 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality'").

Howard's argument that § 231(a)(3) applies broadly to protected speech similarly ignores the clear directive from the Supreme Court that courts should avoid "constitutional problems" by asking whether the statute is "subject to [] a limiting instruction." *Ferber*, 458 U.S. at 769 n.24 (citation omitted); *see Clark v. Martinez*, 543 U.S. 371, 385 (2005) (constitutional avoidance canon "comes into play" if a statute is "susceptible of more than one construction" even after the "application of ordinary textual analysis"). The inclusion of a *mens rea* element is precisely the kind of limit that the Supreme Court and the Seventh Circuit have endorsed. As the Seventh Circuit has explained, "'the general rule is that a guilty mind is a necessary element in the indictment and proof of every crime' and courts should 'generally interpret criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them.'" *United States v. Wade*, 962 F.3d 1004, 1011 n. 3 (7th Cir. 2020) (quoting *Elonis*, 575 U.S. at 734). Interpreting § 231(a)(3) "in a constitutionally permissible light" to include intent does not rewrite the statute. *Banks*, 368 F. Supp at 1247.

§ 231(a)(3) requires intent, which limits the prohibition on "any act" to those acts which are designed to impede or obstruct. *See Foran*, 411 F.2d at 937–38 (concluding that the intent requirement and "narrowing phraseology" make the statute different from other interfering and resisting statutes); *Mechanic*, 454 F.2d at 854. The intent element in § 231(a)(3) is a powerful

21

limitation on criminal liability, and the parade of horribles described in Howard's motion is illusory.

>    c.   Even if § 231(a)(3) Could Incidentally Criminalize Some Speech or
>         Expression, This Does Not Render the Statute Unconstitutional.

Even if § 231(a)(3) were to apply to particular forms of conduct that might incidentally implicate speech, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949); *see also United States v. Huff*, 630 Fed. App'x 471, 485–86 (6th Cir. 2015) (noting, in the context of § 231(a)(2), "[t]he First Amendment does not give individuals the right to break a generally applicable law for expressive purposes." (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65–66 (2006))). The Ninth Circuit recently affirmed this principal in *Rundo*, when it recognized that the anti-riot statute, 18 U.S.C. 2101, permissibly criminalized both acts and unprotected speech that incites or instigates a riot or that constitutes a true threat. 2021 WL 821938 at *7, 9. Furthermore, to the extent that § 231(a)(3) might apply to speech in hypothetical scenarios that are not present in this case, such speech is unprotected because it is integral to the criminal conduct of obstructing police or firefighters. *See United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (including "speech integral to criminal conduct" as a class of speech "which ha[s] never been thought to raise any Constitutional problem") (internal citations omitted); *Williams*, 553 U.S. at 298 ("Many long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech (commercial or not) that is intended to induce or commence illegal activities."); *Giboney*, 336 U.S. at 498 (constitutional

freedom of speech does not "extend[ ] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.")

Contrary to Howard's argument (Doc. #27, at 23–24), the statute does not apply to protected speech such as criticizing law enforcement through yelling or gestures. Furthermore, Howard cites no cases in which this statute has been applied to conduct that merely annoys or offends police or firefighters. As the Supreme Court has explained, the "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Williams*, 553 U.S. at 303 (quoting *Taxpayers for Vincent*, 466 U.S. at 800).

> d.   Section 231(a)(3) Has a Plainly Legitimate Sweep.

As discussed above, § 231(a)(3) has a legitimate sweep of targeting unprotected conduct. Howard has failed to identify a single example of an actual prosecution under that section based on protected speech. The express terms of § 231(a)(3) render the possibility of any such prosecution remote at best, and any such case could be the subject of an as-applied challenge. *See Foran*, 411 F.2d at 938 (stating that § 231(a)(3) is "markedly dissimilar from" prior resisting and interfering statute that "involved a broad prohibition of possibly innocent acts and also lacked narrowing phraseology"). And Howard raises only a facial challenge to the statute in his motion because his own conduct—assaulting a police officer by throwing a brick—is certainly not constitutionally protected speech or conduct. Howard's actions are exactly the type of conduct § 231(a)(3) legitimately targets.

Facial invalidation of a statute due to overbreadth is only warranted when a statute presents a "realistic danger" of chilling speech of third parties. *Taxpayers for Vincent*, 466 U.S. at 801. Howard has failed to meet his burden to identify any such realistic danger.

23

> e. Strict Scrutiny Does Not Apply because Section 231(a)(3) Does Not Cover Protected Speech.

Howard argues that this Court should apply strict scrutiny review because § 231(a)(3) is a content- and viewpoint-based restriction on speech. (Doc. #27, at 27). That argument fails at the outset because § 231(a)(3) prohibits only obstructive conduct and unprotected speech directly linked to such conduct. Even assuming the statute regulates speech to such a degree that a level of scrutiny applies to this analysis, the Court should apply intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968), because the statute regulates conduct that only incidentally affects speech and applies irrespective of any expressive content. *See Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702, 723 (7th Cir. 2003). Section 231(a)(3) easily survives such scrutiny because it is narrowly tailored to advance important governmental interests in enabling first responders to protect channels of interstate commerce from being disrupted by violent civil disorders. Howard's misplaced reliance on isolated statements by one Senator does not transform into impermissible viewpoint discrimination a statute that, on its face, applies neutrally regardless of a defendant's views.

In sum, statutes criminalizing obstructive conduct in the context of violent civil disorders do not violate the free speech protections of the First Amendment. *See Mechanic,* 454 F.2d at 852. Interpreting the statute to criminalize those violent acts—and not protected speech—is consistent with Congress' intent and dooms defendant's overbreadth claim. *See Banks*, 368 F. Supp. at 1247 (construing civil disorder statute "in constitutionally permissible light"). For these reasons, Howard's First Amendment challenge to the statute fails. *See Rupert*, 2021 WL 942101 at *9 (because "Section 231(a)(3) does not apply to First Amendment activity, [the defendant's] facial overbreadth challenge to the civil disorder statute fails").

24

3. Howard Lacks Standing to Raise a Facial Vagueness Challenge, but his Argument is Meritless Regardless.

Howard's final constitutional challenge is that § 231(a)(3) is unconstitutionally vague, in violation of the Fifth Amendment. Specifically, Howard claims the following terms are too vague to satisfy the requirements of Due Process: (1) "any act"; (2) "to obstruct, impede, or interfere"; (3) "incident to and during the commission of a civil disorder"; (4) "in any way obstructs, delays, or adversely affects commerce; and (5) "civil disorder". (Doc. #27, at 34). However, Howard does not appear to challenge the statute as applied to the specific facts of his case. *See id.* at 33–38. Thus, it appears Howard is making only a facial vagueness challenge, for which he lacks standing.

The issue of standing to raise facial vagueness challenges to a statute has been directly addressed in this Circuit. A defendant "who engages in some conduct that is clearly proscribed," such as assaulting a police officer, "cannot complain of the vagueness of the law as applied to the conduct of others." *United States v. Bonin*, 932 F.3d 523, 537 (7th Cir. 2019) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20(2010)); *see also Mechanic*, 454 F.2d at 853; *Huff*, 630 Fed. App'x at 488. Thus, Howard must demonstrate § 231(a)(3) is vague as applied to him before he can raise a facial vagueness challenge on behalf of others. Where, as here, the defendant's conduct is "clearly proscribed," there is "no reason to evaluate the merits of his vagueness claim." *Bonin*, 932 F.3d at 537.

Even if this Court were to find that Howard had standing, his challenge fails on the merits. A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at

25

732 (*citing City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)); *see also Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61,* 251 F.3d 662, 666 (7th Cir. 2001).

In his brief, Howard argues that the statute "provides no express *mens rea* at all, leaving police, prosecutors, and judges to decide whether the statute requires knowledge (and if so, of what) or specific intent (and if so, to do what) or neither." (Doc. #27, at 35). This claim fails because § 231(a)(3), by its terms, should be and has been construed by courts to require proof of intent, as explained above. *See Foran*, 411 F.2d at 937; *Mechanic*, 454 F.2d at 854. As the Supreme Court "has made clear[,] scienter requirements alleviate vagueness concerns." *Gonzales v. Carhart*, 550 U.S. 124, 129 (2007); *accord Jones*, 975 F.3d at 1048 (noting that "even laws that are in some respects uncertain may be upheld against a vagueness challenge if they contain a scienter requirement"); *Habib*, 2020 WL 3097819, at *3 (citing *McFadden v. United States*, 576 U.S. 186, 197 (2015) (scienter requirement "alleviates vagueness concerns, narrows the scope of the prohibition, and limits prosecutorial discretion")).

Section 231(a)(3) is "sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden." *Mechanic*, 454 F.2d at 854. As the Eight Circuit explained, the statute's

> scope is consistently narrowed by each subsequent phrase of the definition of 'civil disorder.' Thus, it is not just any public disturbance which is the subject of the section, but only public disturbances which (1) involve acts of violence (2) by assemblages of three or more persons, and which (3) cause immediate danger of or result in injury to (4) the property or person of any other individual.

*Id.* at 853. Courts have similarly analyzed other provisions of the civil disorder statute and found those provisions not to be unconstitutionally vague. *See Huff*, 630 Fed. App'x. at 487–89 (rejecting defendant's argument that § 231(a)(2) was unconstitutionally vague);

*Featherston,* 461 F.2d at 1121 (upholding § 231(a)(1) as "sufficiently definite to apprise men of common intelligence of its meaning and application"). The statute's intent is plain and provides Howard constitutionally adequate notice that his behavior was illegal; no one could credibly claim to believe that he could lawfully assault an on-duty police officer by throwing a brick or similar object during a civil unrest.

Accordingly, even assuming Howard has standing to raise a facial vagueness challenge, his argument should be denied on the merits.

### D. The Indictment Provides Sufficient Notice.

In addition to his constitutional challenges to § 231(a)(3), Howard makes a brief alternative argument that dismissal is warranted because the indictment is deficient. (Doc. #27, at 38–40). Specifically, Howard claims the lack of specificity in the indictment fails to provide sufficient notice, and that it also leaves open questions about whether sufficient facts were presented to the grand jury to support the indictment. *Id.* at 39. These arguments lack merit and should be rejected.

The Federal Rules of Criminal Procedure require that an indictment be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The Seventh Circuit has noted that to be sufficient, an indictment must fulfill three distinct functions: (1) "the indictment must state all of the elements of the crime charged"; (2) "it must adequately apprise the defendant of the nature of the charges so that he may prepare a defense"; and (3) "it must allow the defendant to plead the judgment as a bar to any future prosecutions for the same offense." *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000). "Indictments are reviewed on a practical basis and in their entirety, rather than 'in a hypertechnical manner.'" *Id.* (quoting *United States v. McNeese*, 901 F.2d 585, 602 (7th Cir.

1990)). "'Generally, an indictment is sufficient when it sets forth the offense in the words of the statute itself, as long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished.'" *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996) (quoting *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir. 1981)).

As an initial matter, Howard's claim that he does not have sufficient notice of the facts underlying the indictment conflicts with the record. Howard was advised of the conduct underlying the charge at his detention hearing, *see* Doc. #6–7, and he was provided copies of search warrant affidavits discussing in detail the investigation into his conduct on August 23, 2020. *See* Case No. 20-MJ-508. Furthermore, he has received full discovery in this case. If there was any legitimacy to his argument that he did not understand the charges, Howard could have filed a motion or a bill of particulars. He has not done so.[13]

The indictment returned by the grand jury conforms with all requirements of Federal Rule of Criminal Procedure 7(c). It recites the language of the statute, the date of the alleged offense, and citation to the applicable statutes. Accordingly, Howard's alternative argument for dismissal should be rejected.

## IV.    CONCLUSION

Multiple individuals were present during the civil disorder in Kenosha on and after August 23, 2020. To date, however, only one individual—defendant Ashton Howard—has been charged with violating 18 U.S.C. § 231(a)(3). That is because Howard, through his violent action, intentionally obstructed, impeded, and interfered with the Kenosha Police Department's

---

[13] Even if Howard had moved for a bill of particulars, he would face a substantial hurdle given that he has received substantial discovery. *See, e.g., United States v. Canino,* 949 F.2d 928, 949 (7th Cir. 1991) (affirming denial of motion for bill of particulars, noting that the government followed the so-called "open file" policy, and the defendant had access to substantial discovery); *see also United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003).

28

ability to quell the civil disorder that was ongoing. It is his violent conduct, and not any peaceful protest or protected speech, that underlies this prosecution. The statute is constitutional under the Commerce Clause and the First and Fifth Amendments and was employed in this district in a constitutional manner, and the indictment provides the defendant with sufficient notice of the charge against him.

For the above reasons, the government respectfully requests that the defendant's motion be denied.

Dated at Milwaukee, Wisconsin, this 30th day of April, 2021.

RICHARD G. FROHLING
Acting United States Attorney

By:    s/ John P. Scully
JOHN P. SCULLY
BENJAMIN PROCTOR
Assistant United States Attorneys
Eastern District of Wisconsin
517 E. Wisconsin Ave., Suite 530
Milwaukee, Wisconsin 53202
Tel: (414) 297-1700
Fax: (414) 297-1738
Email: john.scully2@usdoj.gov
      benjamin.proctor@usdoj.gov